UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SANDRA A. CUNNINGHAM,
Next Friend of P.A., a minor,

      Plaintiff,

-v-

No.
Hon.

OXFORD COMMUNITY SCHOOL DISTRICT,
TIMOTHY THRONE, in his individual capacity;
STEVEN WOLF, in his individual capacity;
NICHOLAS EJAK, in his individual capacity;
SHAWN HOPKINS, in his individual capacity;
jointly and severally,

      Defendants.

## COMPLAINT AND JURY DEMAND

NOW COMES the Plaintiff, SANDRA A. CUNNINHAM, Next Friend of P.A., a minor, by and through her attorneys, MUELLER LAW FIRM, by WOLFGANG MUELLER, and files her Complaint against the Defendants in this civil action, stating unto this Court as follows:

1. This is an action for damages brought pursuant to 42 U.S.C. §§1983 and 1988, the Fourteenth Amendment to the United States Constitution, and the statutes and common law of the State of Michigan, against Defendants, OXFORD COMMUNITY SCHOOL DISTRICT ("OCSD"), TIMOTHY THRONE ("THRONE"), in his individual capacity; STEVEN WOLF ("WOLF"), in his

individual capacity; NICHOLAS EJAK ("EJAK"), in his individual capacity; and SHAWN HOPKINS ("HOPKINS"), in his individual capacity.

2. Jurisdiction is founded upon 28 U.S.C. §1331 and 28 U.S.C. §1343.

3. Venue is proper pursuant to 28 U.S.C. §1391(d), as the situs of the incident was Oakland County, Michigan, within the Eastern District of Michigan, and the parties reside in the Eastern District of Michigan.

4. At all pertinent times, P.A. was a United States citizen and a student in her freshman year at Oxford High School.

5. At all pertinent times, Defendant, THRONE, was employed as the Superintendent of OCSD, and was acting under color of law and within the scope of his employment.

6. At all pertinent times, Defendant, WOLF, was employed as Principal of Oxford High School, within the OCSD, and was acting under color of law and within the scope of his employment.

7. At all pertinent times, Defendant, EJAK, was employed as Dean of Students at Oxford High School, within the OCSD, and was acting under color of law and within the scope of his employment.

8. At all pertinent times, Defendant, HOPKINS, was employed as a school counselor at Oxford High School, within the OCSD, and was acting under color of law and within the scope of his employment.

## GENERAL ALLEGATIONS

9. Ever since mass school shootings in the United States began garnering worldwide attention (Columbine High School, Littleton, CO, 1999; Sandy Hook Elementary School, Newtown, CT, 2012; Stoneman Douglas High School, Parkland, FL, 2018; and numerous others), school administrators and staff, including those at OCSD, have undergone countless training sessions to recognize the symptoms and root causes of such violence.

10. School staff, including those at OCSD, have been educated and trained to recognize patterns in school shootings. Notably, studies of such incidents have revealed that the vast majority of students or former students involved in mass school shootings were suicidal before unleashing their violence on unsuspecting students. Additionally, it has been well known that the overwhelming majority of shooters suffered from mental health crises before the incidents.

11. The purpose of such extensive training and education is to teach school administrators and staff that such actions are not the result of "random acts of violence"; instead, they are predictable and preventable.

12. Tragically, on November 30, 2021, school officials and administrators at Oxford High School ignored their training and took affirmative actions, *in accordance with school policy*, to remove a mentally unstable student, 15-year-old

E.C., from a place of safety in the school counselor's office and return him to the school population, despite his obvious suicidal and homicidal ideations and access to weapons.

13. The unfathomable violence that occurred on November 30, 2021, took the lives of four students and injured six other students, including P.A., and a teacher. The school shooting was both predictable and preventable.

### THE EVENTS ON AND BEFORE NOVEMBER 30, 2021

14. In the fall of 2021, E.C. was in the first semester of his sophomore year at Oxford High School. He became known to school staff, including teachers, counselors, and administrators, as a child who may be suffering from mental illness and/or child abuse and neglect, given his outwardly depressed mood and disheveled appearance.

15. In the weeks leading up to November 30, several events occurred that put Oxford High School teachers, counselors, and administrators on notice that E.C.'s mental health was deteriorating.

16. In early November, E.C.'s Spanish teacher emailed Defendant, HOPKINS, that E.C. seemed "sad." HOPKINS contacted E.C. and told him he was available if E.C. wanted to talk to somebody. E.C. simply responded, "Okay."

17. On or about November 11, students found the severed head of a bird

in a boys' bathroom. It was reported to Defendant, WOLF.[1]

18. WOLF chose not to disclose this incident to school staff or parents.

19. On November 12, OCSD administrators sent an email to Oxford High School parents, stating, "We are aware of the numerous rumors that have been circulating throughout our building this week …. Please know that we have reviewed every concern shared with us and investigated all information provided …. We want our parents and students to know that there has been no threat to our building nor our students."

20. On or around November 16, Defendant, WOLF, was informed by several parents that there were threats made to students at Oxford High School on social media, as well as concerns over severed animal heads at the school.

21. Instead of investigating these threats, which caused several students to be afraid for their safety at school, OCSD administrators, including Defendant, WOLF, blithely ignored the threats.

22. On November 16, WOLF emailed parents, stating, "I know I'm being redundant here, but there is absolutely no threat here at the HS . . . large assumptions were made from a few social media posts, then the assumptions evolved into exaggerated rumors."

---

[1] E.C.'s journal documented that he severed the bird's head. Cell phone records discovered by police after the tragic shooting incident showed video of E.C. severing a bird's head.

23. On November 16, Defendant, THRONE, took to the Oxford HS loudspeaker and told students that there was no credible threat to their safety.

24. On November 26, E.C.'s parents bought him a Sig Sauer 9 mm, semi-automatic handgun as an early Christmas gift.

25. On November 26, 2021, E.C. posted a picture of the Sig Saur 9 mm semi-automatic handgun to his social media account with the caption: *"[J]ust got my new beauty today [heart eyes emoji] Sig Saur 9 mm. Any questions I will answer."*

26. The next day, E.C.'s mother posted the following to her public social media account: *"[M]om and son day testing out his new Christmas present."* The posting was a clear reference to E.C. firing his handgun at a shooting range.

**November 29, 2021**

27. On November 29, E.C.'s Spanish teacher emailed Defendant, EJAK, and Pam Fine, OCSD's Restorative Practices Coordinator, telling them that E.C. had been using his cell phone during class to look up information about bullets.

28. The email was forwarded to Defendant, HOPKINS, E.C.'s counselor.

29. At about 9:00 that morning, E.C. was summoned to Ms. Fine's office for a meeting with Fine and HOPKINS. The meeting only lasted five minutes.

30. During the short meeting, E.C. was informed that looking up bullets while in school was not "school appropriate behavior."

31. In response, E.C. informed HOPKINS and Fine that he had gone to a gun range with his mother over the weekend and tested out his new handgun. He claimed that he was simply researching information about bullets because shooting guns was his hobby.

32. E.C. was returned to class. Fine then called E.C.'s mother and left her a voicemail message. Per OCSD policy, E.C.'s mother was not required to return the call, as the incident had not been deemed a "disciplinary incident."

33. On November 29, E.C. posted on his public Twitter account, *"Now I am become Death, the destroyer of worlds. See you tomorrow Oxford."*

**November 30, 2021**

34. On November 30, at approximately 8:30 a.m., E.C.'s English teacher sent an email to HOPKINS stating that E.C. had been watching a violent shooting video on his cell phone during class hours.

35. Shortly before 9:00 a.m., E.C.'s math teacher reported to EJAK that E.C. drew extremely disturbing pictures and words on his math assignment. The math assignment showed a picture of E.C.'s handgun with gunshot wounds to the torso and blood coming from the victim's mouth. A bullet was drawn under the words, *"Blood everywhere."* A crying face emoji was on the paper with the words, *"The thoughts won't stop. Help me"* and *"My life is useless."*

7



**E.C. drawing November 30, 2021**

36. The math teacher took a photo of the page before E.C. was able to change it by scratching out the drawings and words, replacing them with *"video game this is"; harmless act"; I love my life so much!!!!"; OHS rocks!";* and *"we're all friends here."*

37. EJAK advised HOPKINS of the drawings he had seen. HOPKINS went to E.C.'s class and took him to the counseling office.

8

38. EJAK then went to the math classroom and found E.C.'s backpack. He took the backpack to the counseling office.

39. In handling the backpack, EJAK could tell that the backpack was unusually heavy for a school backpack and that the weight was not evenly distributed as a backpack would be if filled with books.

40. The weight and distribution were unusual because the backpack was filled with a Sig Sauer 9 mm metal handgun and 48 bullets.

41. EJAK took the backpack to the counseling office where E.C. and HOPKINS waited. EJAK kept the backpack within his possession and control.

42. EJAK and HOPKINS questioned E.C. about the shooting video he was watching on his phone in English class. EJAK told the men that he was watching a video game.

43. Neither EJAK nor HOPKINS verified whether E.C. had been watching a video game.

44. E.C. was questioned about the disturbing drawings on his math assignment. E.C. simply stated that it was for a video game he wanted to design.

45. HOPKINS responded, "This does not sound like a video game," indicating that he did not believe E.C.'s explanation.

46. E.C. suddenly became sad and described many stressors that had occurred recently in his life, including the death of his beloved dog, the death of a

grandparent, and the loss of a close friend who had to leave school.

47. EJAK and HOPKINS, both well trained in spotting signs of mental illness and potential school violence, deemed E.C. to be suicidal with homicidal ideations, as evidenced by the disturbing drawings in his math assignment.

48. However, when HOPKINS asked E.C. if he was a threat to himself or others, E.C. responded, *"I can see why this looks bad. I'm not going to do anything."*

49. HOPKINS would later testify that he did not accept E.C.'s answer, concluding that E.C. was "a threat to himself in spite of his statement."

50. Despite HOPKINS' self-serving statement, he and EJAK had actual knowledge that E.C. was homicidal and that he posed a significant and substantial threat to foreseeable victims; namely, students within the confined school building.

51. HOPKINS then contacted E.C.'s mother, who was told to come to school for a meeting about her son.

52. At approximately 10:30 a.m., E.C.'s mother and father walked into the counseling office.

53. EJAK and HOPKINS were immediately struck by E.C.'s parents' lack of warmth toward their child and their display of outward coldness toward him.

54. HOPKINS proceeded to tell the parents why he was concerned about E.C.'s mental health status, explaining the events from that morning and the

previous day. He explained that he thought E.C. was suicidal and that he needed counseling, "today, if possible."

57. E.C.'s parents refused to take him to counseling that day because they both had to return to work.

56. In front of E.C., HOPKINS told the parents that if E.C. didn't receive mental health counseling within 48 hours, he would report the parents to Child Protective Services ("CPS"). The clear implication of this statement, or threat, was that E.C. would be removed from the house and the parents would lose custody over their child.

57. E.C.'s parents adamantly refused to take E.C. home that day. Instead, E.C.'s mother insouciantly asked, *"Are we done?"*

58. HOPKINS turned to EJAK and asked whether there was any disciplinary issue that would prevent E.C. from returning to class. When EJAK responded, "*No*," HOPKINS told the parents, *"I guess we are done."*

59. The threat about contacting CPS had the clear and obvious effect of accelerating E.C.'s already rapidly deteriorating mental health.

59. During the entirety of the meeting, E.C.'s backpack, with a handgun and bullets, sat in the office unsearched, despite EJAK having handled it and knowing of its weight and uneven distribution.

60. EJAK and HOPKINS deliberately chose not to search E.C.'s

backpack (or locker), despite a Michigan statute stating that a student has no expectation of privacy in a backpack or locker. MCL 380.1306.

61. EJAK and HOPKINS, being well-trained in spotting issues of mental health and their relation to mass school violence, recognized that E.C.'s parents were either mentally incapable of helping their son or simply unwilling to do so.

62. At that point, E.C.'s parents left the school. EJAK and HOPKINS chose to return E.C. to his classroom with his backpack. In doing so, EJAK and HOPKINS took E.C. from a place of safety and placed him in the school population with complete access to his handgun and bullets.

63. EJAK and HOPKINS, despite recognizing that E.C. was suicidal and homicidal, deliberately chose not to involve the school's liaison police officer, an Oakland County Sheriff's deputy with specific training in dealing with students like E.C.

64. The first thing the sheriff's deputy would have done upon being notified of the circumstances would be to check E.C.'s backpack and locker. The gun and bullets would have been discovered and E.C. would have been expelled from school. The tragedy would have been avoided.

65. Instead, within two hours of being let back into the school population, E.C. went into a bathroom with his backpack and emerged with his Sig Sauer handgun.

66. E.C. began to shoot at any student he saw, hell-bent on causing as much destruction as possible, as predicted the day before on his public Twitter account, when he posted, *"Now I am become Death, the destroyer of worlds. See you tomorrow Oxford."*

67. When he was done with the rampage, three students were dead (a fourth student would die from his wounds the next day). Additionally, six other students, including P.A., and one teacher were severely wounded. P.A., standing less than ten feet from E.C. as he emerged from the boys' restroom, was shot in the neck, with another bullet grazing her cheek.

68. As a direct and proximate result of Defendants' misconduct, set forth herein, P.A. suffered the following injuries and damages:

    a. Gunshot wound to the left neck with bullet trajectory through the thoracic cavity;

    b. Necessity for placement on ventilator for several days;

    c. Brachial plexus injury resulting in loss of full movement of left shoulder and arm;

    d. Development of Complex Regional Pain Syndrome (CRPS);

    e. Comminuted fracture of left 1st and 3rd ribs;

    f. Gunshot wound to left cheek;

    g. Left hemothorax;

    h. Tremendous physical pain and suffering;

      i.      Tremendous emotional distress and depression;

      i.      Future loss of earning capacity;

      k.      Inability to enjoy activities of daily living as before;

      l.      Significant humiliation and embarrassment;

      m.      Medical bills associated with her extensive hospitalization and follow-up care;

      n.      Out-of-pocket expenses;

      o.      Other economic and non-economic damages which are ongoing and will be permanent.

## COUNT I

### 14th AMENDMENT "STATE CREATED DANGER" BY DEFENDANTS EJAK AND HOPKINS

69.    Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

70.    At all times, P.A. had a constitutional right, secured by the 14th Amendment, not to be deprived of her life and substantive due process by government actors, acting with deliberate indifference, who placed a mentally ill student with homicidal and suicidal ideations back into the school population after he was safe and secure within the confines of the school counselor's office.

71.    P.A.'s constitutional right to bodily integrity and not to be deprived of life and due process was clearly established before November 30, 2021. *Kallstrom*

*v. City of Columbus,* 136 F.3d 1055, 1063 (6th Cir. 2006) ("[i]t goes without saying that an individual's 'interest in preserving her life is one of constitutional dimensions.' ") (quoting *Nishiyama v. Dickson County*, 814 F.2d 277, 280 (6th Cir. 1987 (en banc)); *McQueen v. Beecher Comm. Schools,* 433 F.3d 460 (6th Cir. 2006) (where a student shot and killed another student after being left alone by a teacher, the court stated, "[t]herefore, the first §1983 element – deprivation of a right secured by the Constitution or laws of the United States – is clearly satisfied.").

72. EJAK and HOPKINS' affirmative act of sending E.C. back to class while knowing he exhibited suicidal and homicidal ideations and had access to guns, as described above, created or increased the risk that P.A. would be exposed to an act of violence by E.C.

73. EJAK and HOPKINS' affirmative act created a special danger that P.A. and other students within the closed school building would be placed specifically at risk, as opposed to the public at large.

74. Since the risk of violence was so obvious under the above-described circumstances, EJAK and HOPKINS knew or should have known that their actions specifically endangered P.A. and the other students within the closed school building.

75. In returning E.C. to the school population after the parents' meeting,

EJAK and HOPKINS acted with deliberate indifference to the constitutional rights of P.A. and other students in the school. Defendants had plenty of time for reflection and unhurried judgment before choosing their fateful course of action.

76. EJAK and HOPKINS' actions would shock the conscience of any reasonable person looking at the circumstances of November 30, 2021, as it was perfectly clear that E.C. was crying out for help and his parents were mentally unfit or unwilling to help. Thus, EJAK and HOPKINS were the only two adults left in the room who could have prevented this predictable tragedy. They failed.

## COUNT II

### *MONELL* LIABILITY OF OCSD UNDER 42 U.S.C. §1983

77. Plaintiff incorporates by reference each and every previous allegation.

78. On and before November 30, 2021, OCSD had policies and customs in place that included, at a minimum:

    a. An official policy of preventing trained staff and school administrators from suspending students or removing them from school unless there existed a "disciplinary justification" for such actions;

    b. An unofficial custom or practice of preventing trained staff and school administrators from suspending students or removing them from school unless there existed a "disciplinary justification" for such actions;

    c. An unofficial custom or practice of minimizing or misrepresenting the severity of threats of violence by students or failing to adequately investigate same;

    d.    An unofficial custom or practice of not notifying law enforcement officials, including the school's liaison officer, of the foreseeable risk of violence to students from another student;

    e.    An unofficial custom or practice of minimizing or misrepresenting the severity of threats of violence by students in mental health crises if they did not comport with the OCSD's definition of a "disciplinary justification" for such actions;

    f.    An unofficial custom or practice of discouraging staff from reporting suspected child abuse or neglect, in dereliction of their duties as mandatory reporters under MCL 722.623; and,

    g.    An unofficial custom or practice of discouraging staff from searching student lockers and their contents, including backpacks, despite students having no expectation of privacy under MCL 380.1306.

79. The OCSD policies, customs, and practices, were the moving force behind the constitutional violations committed against P.A. and others by the above-named individual Defendants.

## COUNT III

### GROSS NEGLIGENCE BY DEFENDANTS THRONE, WOLF, EJAK, AND HOPKINS

80. Plaintiff incorporates by reference each and every previous allegation.

81. On and before November 30, 2021, the above-named individual Defendants were under a duty not to act with reckless disregard for the safety of foreseeable individuals entrusted to their care, including P.A. and other students in

Oxford High School.

82. Defendants breached their duties in at least the following manner:

   a. EJAK and HOPKINS, despite their actual knowledge of E.C.'s mental health crisis, his parents' ambivalence toward his mental health, and E.C's suicidal and homicidal ideations that day, deliberately chose to allow E.C. to return to class with his backpack and not to contact the school liaison officer, who would have been equipped to prevent such violence;

   b. WOLF and THRONE repeatedly minimized and misrepresented the severity of the threat of violence in the weeks leading up to the tragedy, describing them as "exaggerated rumors" and stating that there was "no threat to our building nor our students."

   c. Defendants' actions constitute "gross negligence," defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a).

   d. The individual Defendants' gross negligence was the proximate cause of Plaintiff's injuries and damages.

## PRAYER FOR DAMAGES

WHEREFORE, Plaintiff, SANDRA A. CUNNINGHAM, Next Friend of P.A., a minor, prays for damages against Defendants for their wrongful conduct, jointly and severally, including:

   a. Past and future compensatory damages against all defendants pursuant to 42 U.S.C. §1983;

   b. Punitive damages as to the individual defendants pursuant to 42 U.S.C. §1983;

   c. Reasonable attorney fees and costs pursuant to 42 U.S.C.

  §1988;

d.  The costs and disbursements of this action pursuant to 42 U.S.C. §1920;

e.  Such other and further relief as appears just and proper.

            *s/Wolfgang Mueller*
            MUELLER LAW FIRM
            Attorney for Plaintiff
            41850 W. 11 Mile Road, Ste. 101
            Novi, MI 48375
            (248) 489-9653
            wolf@wolfmuellerlaw.com
            (P43728)

Dated: June 23, 2022

## **JURY DEMAND**

Plaintiff demands a jury trial in the above-captioned matter.

            *s/Wolfgang Mueller*
            MUELLER LAW FIRM
            Attorney for Plaintiff
            41850 W. 11 Mile Road, Ste. 101
            Novi, MI 48375
            (248) 489-9653
            wolf@wolfmuellerlaw.com
            (P43728)

Dated: June 23, 2022